UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

LESLEY REEVES,                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )    Case No. 2:11CV36 FRB
                                  )
MICHAEL J. ASTRUE, Commissioner   )
of Social Security,               )
                                  )
          Defendant.              )


<u>**MEMORANDUM AND ORDER**</u>

          This matter is on appeal from an adverse ruling by the
Commissioner of Social Security.  All matters are pending before
the undersigned United States Magistrate Judge, with consent of the
parties, pursuant to 28 U.S.C. § 636(c).

## I.   Procedural Background

          In February of 2009, plaintiff Lesley Reeves
("plaintiff") applied for Supplemental Security Income ("SSI")
under Title XVI of the Social Security Act ("Act") and for
Disability Insurance Benefits ("DIB") under Title II of the Act,
alleging that she became unable to work due to disability on
October 1, 2007.  (Administrative Transcript ("Tr.") 125-40).
After her applications were denied, she requested a hearing before
an administrative law judge ("ALJ") which was held on October 16,
2009. (Tr. 35-75).  On November 4, 2009, the ALJ issued a decision
in which he determined that plaintiff was not disabled under the

-1-

Act.  (Tr. 21-34).

Plaintiff sought review from defendant agency's Appeals Council, which denied her request for review on March 11, 2011. (Tr. 1-3).  The ALJ's decision thus stands as the Commissioner's final decision under 42 U.S.C. § 405(g).

## II.    Evidence Before The ALJ

### A.   Plaintiff's Testimony

The administrative hearing began with plaintiff responding to questions posed by the ALJ.  Plaintiff, age 31 at the time of the administrative hearing, testified that she was married and lived in a mobile home with her husband and two children, aged thirteen and six.  (Tr. 39-40).  Plaintiff testified that she was five feet, two inches tall and weighed three hundred and sixteen pounds; was right-handed; and had a valid driver's license with no restrictions.  (Id.)  She testified that she completed the ninth grade and had been enrolled in special education classes, and made an unsuccessful attempt to obtain a G.E.D.  (Tr. 40-41).

Plaintiff's most recent employment was as a part-time day care worker.  (Tr. 41).  Plaintiff left this employment in 2007 because "[i]t was low hours and I had pain starting really, it was, more pain."  (Tr. 41, 43).  Plaintiff's last full-time job, in which she worked in a factory assembling hoses, ended in 2001. (Tr. 41-42).  She testified that she left this job because she was laid off, and she received unemployment benefits.  (Tr. 42).

Plaintiff testified that she also worked in the past as an order taker. (Tr. 42).

Regarding her physical conditions, plaintiff testified that she could not stand on her feet for very long due to fibromyalgia and arthritis. (Tr. 44). Plaintiff and the ALJ then had the following exchange:

Question (by the ALJ): Okay. Anything else or is that it?

. . .

Answer (by plaintiff): Physical? No, that's it.

Q: You also have an issue with your weight is that right?

A: Yes, yes sir.

Q: Okay. Now your conditions if you take them together they affect your ability to do basic work functions like standing and walking because of that?

A: Yes sir.

Q: How about sitting? Is that difficult for you?

A: I can do it but it's just painful.

Q: Lifting and carrying difficult?

A: Yes sir.

Q: Are you getting treatment for your conditions?

A: Yes sir.

Q: Who do you see?

A: I see Dr. Jackson and Dr. Glanton [phonetic].

(<u>Id.</u>)

Plaintiff described Dr. Jackson as a rheumatologist, and

-3-

Dr. Glanton as a pain specialist. (Tr. 45). She testified that her pain medications helped her and caused no side effects. (Tr. 46-47).

Plaintiff testified that she rose in the morning at 6:30, woke her daughter, fed her breakfast, helped her get dressed, and then watched her go to the bus stop at 7:30. (Tr. 47). Plaintiff then took her medication and laid down for two to three hours. (Tr. 47-48). She rose again at 11:00 and took her "noon meds," and took food from the freezer for dinner. (Tr. 48). She then "[tried] to pick up the house a little" until about 3:00 in the afternoon. (Id.) At 3:00, plaintiff relaxed with her feet elevated until about 5:00, after which she had an hour of "family time" with her family, and then the family helped prepare the evening meal, which they ate at 7:00 or 7:30. (Tr. 48-49). After the evening meal, plaintiff ensured that the children bathed, and everyone in the household went to bed at 8:30 or 9:00. (Id.)

Plaintiff testified that she could dress herself, groom and bathe herself, go grocery shopping, do laundry, and do dishes if seated in a chair. (Tr. 49-50). She could not sweep. (Tr. 50). Plaintiff's hobbies included using the computer and talking to family. (Id.) Plaintiff testified that she owned a treadmill and tried to walk on it for exercise. (Id.)

The ALJ asked plaintiff what psychological conditions affected her ability to work, and plaintiff testified "mental depression, lack of skills." (Id.) Plaintiff testified "I have

-4-

depression that bothers me, mentally upsetting, thinking." (Tr. 51). She explained that, in a work setting, her depression would cause her to worry about what's going on and what was happening, and would affect her concentration. (Id.) She testified that she saw her family doctor for treatment for depression. (Id.) Plaintiff denied ever having any formal mental health treatment with a counselor, therapist, psychiatrist or psychologist, but stated that she did go to "Mark Twain Area Counseling" for an evaluation. (Tr. 51-52). Plaintiff testified that the medication she took helped her depression. (Tr. 52).

Plaintiff testified that she saw her family/friends at least once per month, both in their homes and in hers. (Id.) Plaintiff belonged to a club called Northeast Scholarship Pageant. (Tr. 53).

Plaintiff testified that she had no difficulty getting along with others, but did have trouble concentrating. (Id.) The ALJ asked plaintiff to give an example "of a specific time you had a problem" with concentration, and plaintiff testified "[m]y son was taken on December 27 and it made me have a lot of concentration problems." (Id.) Plaintiff explained that her son was taken to "DYS" because he "had trouble not wanting to go to school." (Id.)

Plaintiff testified that she had constant pain "all over" which she characterized as burning and sharp, and which was exacerbated by physical activity. (Tr. 54). She testified that she could lift five pounds. (Id.) She testified that, in an

eight-hour day, she could walk and sit for four hours, and could stand for three hours.  (Tr. 54-55).  Plaintiff testified that she had problems with using the pedals when driving inasmuch as her feet "start aching and hurting kind of."  (Tr. 55).

Plaintiff then responded to questions from her attorney. Plaintiff testified that there were some days she could not even walk on her treadmill for two minutes.  (Tr. 56).  She testified that she could walk less than a block before needing to rest, and that she used a cane.  (Id.)  She testified that she could walk on the street for only five or ten minutes before needing to rest for fifteen minutes.  (Tr. 57).  Plaintiff testified that she knew that there were sixty minutes in an hour.  (Id.)  She testified that she did everything in a computer-type chair with wheels, and used a hand-held "grabber" to help her pick up objects.  (Tr. 58).  She testified that she did laundry while leaning up against the machine.  (Id.)  Plaintiff testified that, when shopping, she used an electric wheel chair.  (Tr. 59).  She testified that she required help with bathing inasmuch as her husband had to help her get out of the tub, and that she had trouble putting on her socks and shoes.  (Id.)

Plaintiff then testified that she suffered from migraine headaches that occurred twice per week and lasted for three hours each; that sometimes caused nausea; and necessitated the use of

Darvocet[1] and lying down in a dark room. (Tr. 60). She testified that her fibromyalgia affected her back, knees, feet, elbows, shoulders, and hands. (Tr. 61). She testified that she had undergone carpal tunnel release surgery in 2002, and had daily pain and symptoms in both of her hands to the point she was unable to "grab" things. (Tr. 61-62). Plaintiff testified that she suffered from extreme urinary incontinence three times per week and soiled her clothing to the point she had to change. (Tr. 62-63). She testified that Lasix caused daily swelling and pain in her feet and hands and calves. (Tr. 63). She testified that she had trouble going to sleep, and that once she fell asleep she woke every hour due to pain in her knees and back. (Tr. 65-66). She required six pillows to use to prop herself in bed. (Tr. 66). Plaintiff testified that she had no energy and napped in the morning and in the afternoon depending on whether "something's going on at school or something." (Id.)

Plaintiff testified that she had trouble with her memory. (Tr. 67). When asked to explain this, plaintiff testified that she had "blockage of [her] childhood and concentration problems." (Id.) Plaintiff explained that, when she was five years old, her mother left her at a gas station, and her grandmother came to get her and raised her from that point forward. (Id.)

Plaintiff testified that she had crying spells that

---

[1]Darvocet N-100 Propoxyphene is used to relieve mild to moderate pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682325.html

occurred "[a]t least every other day" and lasted for two to three hours. (Tr. 68). She testified that she had panic attacks approximately three times per month, during which she became "emotionally worked up" and cried for three to four hours. (Tr. 68-69). She testified that, four times per week, her depression caused her to not get out of bed or get dressed. (Tr. 69-70). She testified that she could only stand for three to five minutes before needing to rest for ten to fifteen minutes. (Tr. 70).

The ALJ then heard testimony from a vocational expert (also "VE"). The ALJ elicited detailed background information from the VE concerning, among other things, the classification of plaintiff's past work, and presented the VE with a hypothetical question. (Tr. 71-73). The VE testified that such a person would be unable to perform plaintiff's past work, but could perform various other work existing in the local and national economies, such as final assembler, table worker, and hand labeler. (Tr. 72-74). The VE identified the specific codes for each of those positions as provided in the Dictionary of Occupational Titles (also "DOT"), and testified that the jobs identified were consistent with the descriptions in the DOT and its companion publication, the Standard Characteristics of Occupations. (Tr. 74).

B.   Medical Records

Records from the Hannibal Clinic indicate that plaintiff was seen on April 9 and April 23, 2007 by Jeffry Evans, M.D. with

-8-

complaints of pain in her low back and hip. (Tr. 274-75). Dr. Evans noted that plaintiff "has been sort of a heavy hitter with the narcotics." (Tr. 275). She had limited range of motion but no problems with ambulation, and was given Darvocet and referred to a pain clinic. (Id.) On August 8, 2007, she complained of numbness in her hands, but testing was negative. (Tr. 276). She was diagnosed with possible carpal tunnel recurrence and given braces and anti-inflammatory medication. (Id.) Electromyography and nerve conduction performed on August 10, 2007 was abnormal, (Tr. 272-73), and when plaintiff returned to Dr. Evans on August 16, 2007 he continued her medication and braces and referred her for an orthopedic evaluation. (Tr. 277).

Plaintiff returned to Dr. Evans on November 28, 2007 with complaints of knee pain. (Tr. 279). Examination revealed right knee crepitation. (Tr. 279). She was diagnosed with osteoarthritis of the knees and received an injection. (Id.)

On January 28, 2008, plaintiff returned to Dr. Evans "to go over all of her health issues." (Tr. 280). She reported taking Cymbalta,[2] Celexa,[3] and occasional Xanax[4] which worked fairly well

_____

[2]Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder, and is also used to treat pain resulting from diabetic neuropathy and fibromyalgia.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604030.html

[3]Celexa, or Citalopram, is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html

[4]Xanax, or Alprazolam, is used to treat anxiety disorders and panic attacks. http://www.nlm.nih.gov/medlineplus/medmaster/a684001.html

for her for the most part. (Id.) She reported sleeping reasonably well, and that her lower extremity edema was controlled with Lasix.[5] (Id.) Dr. Evans noted that plaintiff was morbidly obese and that she was considering bariatric surgery. (Tr. 280-81). Dr. Evans noted that plaintiff's mood and affect were normal with no flat affect or depressed mood, and that she was not anxious. (Tr. 281). She had trace edema in her knees. (Id.) Dr. Evans opined that plaintiff should continue her attempt at diet and exercise. (Tr. 281). Plaintiff received knee injection. (Tr. 278).

Plaintiff returned to Dr. Evans on February 18, 2008 with complaints of right foot and ankle pain after twisting it "some months ago." (Tr. 283). She was also concerned about high triglycerides. (Id.) She had no other complaints. (Id.) She was referred to a podiatrist. (Id.)

On February 19, 2008, plaintiff was seen by podiatrist Scott C. Friedersdorf, D.P.M., with complaints of right foot pain. (Tr. 284). Plaintiff admitted to lower back pain, but denied knee, hip or shoulder pain. (Tr. 284-85). She was diagnosed with tendonitis and told to wear supportive shoes and avoid walking barefoot, and return in three weeks. (Tr. 285-86). She canceled her follow-up appointment. (Tr. 286).

On May 8, 2008, plaintiff saw rheumatologist Imelda P.

---

[5]Lasix, or Furosemide, is a 'water pill' that is used to reduce the swelling and fluid retention caused by various medical problems, including heart or liver disease. It is also used to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682858.html

Cabalar, M.D., with complaints of pain in her feet, ankles, knees, and lower back. (Tr. 287). She denied swelling but had stiffness and joint pain which was "constant throughout the day and better with activity." (Tr. 287). Plaintiff reported a history of smoking one pack of cigarettes per day for the past four years. (Tr. 288). Following examination, Dr. Cabalar noted that plaintiff had diffuse achiness and multiple tender points which was very suggestive of fibromyalgia. (Id.) Plaintiff returned on May 15, 2008 with continued complaints of soreness in her lower back, hips, knees and feet. (Tr. 289). Dr. Cabalar noted that laboratory testing was negative, as were x-rays of plaintiff's lumbar spine, hips, pelvis, and bilateral knees. (Id.) Plaintiff had full range of motion of both shoulders, elbows and wrists with no tenderness or effusion. (Tr. 290). Dr. Cabalar prescribed Neurontin.[6] (Id.)

Records from Jan Onik, D.O., indicate that plaintiff was seen from July 30, 2008 to January 21, 2009 for various complaints, including fibromyalgia. (Tr. 291-96).

On March 3, 2009, plaintiff returned to the Hannibal Clinic and saw Larry Nichols, D.O., with complaints of nasal congestion and a cough. (Tr. 326). She was diagnosed with an upper respiratory infection. (Id.)

On April 21, 2009, Michael Stacy, Ph.D., completed a

---

[6]Neurontin is an anticonvulsant which is used to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles). http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html

Psychiatric Review Technique form. (Tr. 297-307). Dr. Stacy opined that plaintiff's impairments were not severe and that her depression and anxiety did not precisely satisfy the diagnostic criteria as set forth. (Tr. 300-01). Dr. Stacy opined that plaintiff would have a "mild" degree of limitation in maintaining concentration, persistence, or pace, but had no other limitations. (Tr. 305). Dr. Stacy wrote that plaintiff's mental impairments did "not impose significant functional restrictions." (Tr. 307).

On April 22, 2009, Lisa Buhr reviewed plaintiff's medical records and completed a Physical Residual Functional Capacity Assessment form. (Tr. 308-14). Ms. Buhr opined that plaintiff could lift ten pounds; stand and/or walk for at least two hours in an eight-hour workday and sit for six; and could push and/or pull without limitation. (Tr. 309). Ms. Buhr opined that plaintiff could only occasionally climb and balance, but had no other postural limitations. (Tr. 311). Ms. Buhr opined that plaintiff should avoid concentrated exposure to extreme cold and hazards, but had no other environmental limitations. (Tr. 312). Ms. Buhr assessed no other limitations. See (Tr. 308-14).

On April 30, 2009, plaintiff saw Dr. Evans in order "to address depression, anxiety, fibromyalgia, back pain, lower extremity edema, obesity and osteoarthritis." (Tr. 327). Dr. Evans noted that plaintiff's mood was okay, but that plaintiff wanted her Cymbalta dosage increased and her Xanax refilled. (Id.) Plaintiff reported that she took Xanax as needed for anxiety.

(Id.)  She reported that her back bothered her on and off, as it had for years, and that she used "a little Tramadol"[7] for that. (Id.)  Dr. Evans noted that plaintiff had mild lower extremity edema for which she took occasional Lasix, and that plaintiff was trying to lose weight but was "[o]therwise getting along well." (Tr. 327).  Musculoskeletal examination was normal, with full range of motion and full muscle strength.  (Id.)  Her mood and affect were normal with no flat affect or depressed mood, and plaintiff was not especially anxious.  (Tr. 328).

On May 21, 2009, plaintiff returned to the Hannibal Clinic and saw Robert W. Jackson, D.O., for "followup for chronic fatigue and fibromyalgia symptoms along with chronic low back pain." (Tr. 329).  Plaintiff had no radicular pain, and she denied bowel or bladder dysfunction.  (Id.)  Dr. Jackson wrote that plaintiff described having exercise intolerance, and was "seeking Disability for this reason." (Id.)  Upon examination, Dr. Jackson noted diffuse myofascial trigger points over plaintiff's extremities, with lumbosacral tenderness and limited forward flexion.  (Id.)

On June 19, 2009, plaintiff presented to the emergency room of Hannibal Regional Hospital with complaints of a sore throat and ear pain.  (Tr. 349-62).  She also complained of fibromyalgia pain all over her body.  (Tr. 350).  Plaintiff was diagnosed with

---

[7]Tramadol, is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695011.html

a bacterial ear infection (also known as "swimmer's ear") and a common cold, and discharged in stable condition. (Tr. 353-62).

On July 20, 2009, plaintiff presented to the Hannibal Regional Medical Group and saw Luvell Glanton, M.D., for pain management. (Tr. 332-35). Plaintiff reported low back pain aggravated by various postural maneuvers, and fibromyalgia manifested by a "mild burning sensation" in her "buttocks, in the foot, in the forearm, in the hand, in the hip, in the leg, in the neck, in the shoulder, in the upper arm, low back, over the entire body and upper back" with no aggravating or relieving factors. (Tr. 332). Facet injections were performed. (Tr. 334-38).

On August 13, 2009, plaintiff was seen by Dr. Jackson "in followup for her chronic fatigue and fibromyalgia symptoms." (Tr. 377). She reported chronic insomnia. (Id.) Dr. Jackson noted that Dr. Glanton had performed low back injection, and that plaintiff planned on having a radio frequency ablation procedure (also "RFA," an injection procedure used to relieve pain) in the near term. (Id.) Musculoskeletal examination revealed "diffuse myofascial trigger points over extremities and back, consistent with fibromyalgia." (Id.) Her medications were adjusted, and she was advised to return in six to eight weeks. (Tr. 377).

On August 18, 2009, plaintiff was seen at Mark Twain Behavioral Health by Ted Oliver, a licensed clinical social worker. (Tr. 379-82). Plaintiff reported that she was "trying to get Medicaid and Disability due to problems with rheumatoid arthritis

-14-

and fibromyalgia." (Tr. 379). Plaintiff reported that she had been treated for depression by her family doctor for many years and took medication. (Id.) Mr. Oliver noted that plaintiff appeared to have poor concentration but did have good hygiene, clear and goal-directed thoughts, normal judgment and insight, and intact recent and remote memory. (Id.) Plaintiff complained of financial stress secondary to her husband being laid off and her inability to work. (Id.) She stated that she experienced some anxiety in social settings. (Tr. 379). Plaintiff reported being diagnosed and treated for Attention Deficit Hyperactivity Disorder (also "ADHD") as a child, but not as an adult. (Id.) There was no history of psychiatric hospitalizations. (Id.)

Mr. Oliver diagnosed plaintiff with ADHD by history, depressive disorder, reported history of rheumatoid arthritis and fibromyalgia and history of back problems, and chronic health problems and financial stress. (Tr. 379-80). Mr. Oliver wrote, "[i]t appears that [plaintiff's] history of problems with depression is likely connected to chronic health issues. She has not been able to work due to these physical problems for several years." (Tr. 380). It is indicated that Mr. Oliver's report was "read and approved" by Andrew Lovy, D.O. (Id.)

On October 7, 2009, plaintiff returned to Dr. Jackson for follow-up for fatigue, fibromyalgia, low back pain and osteoarthritis of the weight bearing joints. (Tr. 388). Plaintiff complained of persistent pain with the change in weather. (Id.)

-15-

Upon examination, plaintiff had trigger points consistent with fibromyalgia. (<u>Id.</u>) Dr. Jackson noted that plaintiff could ambulate without assistance or adaptive aids. (<u>Id.</u>) He instructed plaintiff to return in four months. (Tr. 388).

On October 8, 2009, Dr. Glanton wrote that plaintiff had a successful medial branch block procedure. (Tr. 396). On October 21, 2009, plaintiff returned to Dr. Glanton with complaints of low back pain that was aggravated by activity and not relieved by anything. (Tr. 403). Dr. Glanton noted that there was no use of assistive devices. (<u>Id.</u>) Dr. Glanton noted that plaintiff had a poor response to the RFA procedure. (<u>Id.</u>) She underwent a sacroiliac injection. (Tr. 416).

On December 2, 2009, plaintiff returned to Dr. Friedersdorf with continued complaints of bilateral foot and ankle pain. (Tr. 435-36). Dr. Friedersdorf diagnosed plaintiff with plantar fasciitis and tendonitis, and advised plaintiff to wear "Powersteps" inserts in a pair of supportive shoes, to never walk barefoot, to perform stretching exercises, and to use an icing technique. (Tr. 435). Dr. Friedersdorf also performed corticosteroid injection. (Tr. 436). Plaintiff returned for follow-up care on December 14, 2009 and reported that she had been wearing the Powersteps inserts in good, supportive shoes, and reported that her foot pain had "tremendously improved." (Tr. 437).

On December 15, 2009, plaintiff returned to Dr. Glanton

for a recheck of fibromyalgia, and Dr. Glanton performed a sacroiliac injection. (Tr. 480, 483, 485-86).

On January 30, 2010, plaintiff presented to the emergency room of Hannibal Regional Hospital with complaints of a severe migraine headache. (Tr. 472). She was treated with prescription pain medication and discharged to home. (Tr. 477).

On February 3, 2010, plaintiff returned to Dr. Evans "to address chest pain, diabetes, weight gain, hyperlipidemia, sleep apnea and fatigue." (Tr. 438). Upon examination, plaintiff's gait was well-coordinated, she had full range of motion in her joints, and full muscle strength and tone. (Tr. 439). She was referred for a cardiac stress test and sleep study. (Id.) On February 9, 2010, plaintiff underwent an EKG, which was interpreted as normal. (Tr. 433). On February 10, 2010, plaintiff was seen by Bassem Mikhail, M.D., with complaints of shortness of breath. (Tr. 460). Dr. Mikhail noted that plaintiff's cardiac stress test was positive for anterior ischemia, and recommended that plaintiff undergo cardiac catheterization. (Id.)

Also on February 10, 2010, plaintiff underwent a sleep study at the Hannibal Clinic. (Tr. 430-32). It was noted that plaintiff had no occurrences of apnea, but did experience numerous arousals from sleep. (Tr. 430). Plaintiff was advised to take various measures to improve her sleep, including avoiding napping during the day. (Tr. 431). Plaintiff was also advised to avoid caffeine and smoking, to not eat large meals before bed, and to

-17-

engage in regular exercise. (<u>Id.</u>)

On February 17, 2010, plaintiff underwent a cardiac catheterization at Hannibal Regional Hospital which revealed no significant coronary artery disease, and a false positive stress test. (Tr. 463).

Plaintiff returned to Dr. Jackson on April 15, 2010 with complaints of breakthrough pain despite her medications. (Tr. 445). She reported that she was trying to exercise a few minutes each day on a treadmill, with the goal of exercising 30 minutes per day in two sessions. (<u>Id.</u>) She had no edema. (<u>Id.</u>) Examination was consistent with fibromyalgia, and her medications were adjusted. (<u>Id.</u>) Also on this date, plaintiff saw Dr. Evans with complaints of depression, sore throat, and swollen salivary glands. (Tr. 446). Upon examination, plaintiff's memory was noted to be intact, her mood and affect appeared normal with no flat affect or depressed mood, and she was not especially anxious. (<u>Id.</u>) She was diagnosed with depression and an upper respiratory infection, and was given an antibiotic. (<u>Id.</u>)

### III.    The ALJ's Decision

The ALJ determined that plaintiff had not engaged in substantial gainful activity since October 1, 2007, her alleged onset date. (Tr. 26). The ALJ determined that plaintiff had the severe impairments of obesity, osteoarthritis, and fibromyalgia, but specifically determined that plaintiff's medically determinable

-18-

impairments of depression and anxiety, considered singly and in combination, caused no more than minimal limitation in plaintiff's ability to perform basic mental work activities and were therefore nonsevere. (Tr. 27). The ALJ determined that plaintiff did not have an impairment or combination of impairments of listing-level severity. (Tr. 28). The ALJ determined that plaintiff had the residual functional capacity (also "RFC") to perform sedentary work except that she was limited to unskilled work, and could only occasionally climb ropes, ladders, scaffolds, ramps, and stairs, and must avoid concentrated exposure to extreme cold and hazards. (Id.) The ALJ determined that plaintiff could not perform her past relevant work, but that there were jobs existing in substantial numbers that plaintiff could perform. (Tr. 32). Thus, the ALJ concluded that plaintiff was not disabled as defined in the Act. (Tr. 33).

## IV. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act (also "Act"), plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140–42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether the claimant's impairment(s) meet or equal any listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to a listed impairment, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the

Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted). The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).

"[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v.

-21-

<u>Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003); <u>see</u> <u>also</u> <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000) (In the event that two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole).

In the case at bar, plaintiff claims that the ALJ's decision is not supported by substantial evidence. In support, plaintiff claims that the ALJ failed to properly evaluate her "chronic fatigue syndrome" and erroneously determined that her mental impairments were nonsevere. Plaintiff also argues that the ALJ's residual functional capacity determination fails to reflect the limitations imposed by her impairments, and that the ALJ erroneously assessed her credibility; failed to properly analyze her obesity; and failed to properly credit Mr. Oliver's opinion. Plaintiff's arguments will be addressed in turn.

A. <u>Chronic Fatigue Syndrome</u>

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because he failed to determine that her "CFS" (chronic fatigue syndrome) was a severe impairment. Review of the record reveals no error.

Plaintiff neither alleged chronic fatigue syndrome in her applications nor presented it as a basis for a finding of disability during her administrative hearing. "An ALJ is not obliged 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis

for disability.'" <u>Gregg v. Barnhart</u>, 354 F.3d 710, 713 (8th Cir. 2003) (quoting <u>Pena v. Chater</u>, 76 F.3d 906, 909 (8th Cir. 1996)).

Furthermore, none of plaintiff's doctors diagnosed her with chronic fatigue syndrome, and there is no evidence to support plaintiff's conclusion that she is actually afflicted with that condition. As plaintiff notes in her brief in support of her complaint, chronic fatigue syndrome "is a systemic disorder consisting of a complex of symptoms that may vary in incidence duration, and severity" and which is "characterized in part by prolonged fatigue that lasts 6 months or more and that results in substantial reduction in previous levels of occupational, educational, social, or personal activities" and is diagnosed "only after alternative medical and psychiatric causes of chronic fatiguing illness have been excluded." (Docket No. 13 at pages 5-6). While Drs. Evans and Jackson did note that plaintiff complained on occasion of fatigue and chronic fatigue, neither doctor used the term "chronic fatigue syndrome," diagnosed plaintiff with chronic fatigue syndrome, nor indicated that chronic fatigue syndrome should be considered or ruled out as a potential diagnosis.

The fact that Drs. Evans and Jackson used the words "chronic" and/or "fatigue" when describing plaintiff's complaints does not equate to an actual diagnosis of the condition of chronic fatigue syndrome. Nor does the fact that plaintiff was diagnosed with fibromyalgia, which plaintiff notes has symptoms similar to

chronic fatigue syndrome, equate to a diagnosis of chronic fatigue syndrome, as plaintiff suggests. Had the ALJ determined that, based upon plaintiff's presentation and symptoms that she had chronic fatigue syndrome even though none of her doctors diagnosed her with that condition, the ALJ would arguably have committed reversible error. See Pratt v. Sullivan, 956 F.2d 830, 834 (8th Cir. 1992) (An ALJ's substitution of his own conclusions for the diagnosis of an examining physician constitutes reversible error).

B.   Mental Impairments

The ALJ in this case determined that plaintiff's medically determinable impairments of depression and anxiety were nonsevere. Plaintiff argues that this finding was erroneous. Review of the record reveals no error.

In determining whether a claimant's mental impairments are "severe," the Commissioner's regulations require the ALJ to consider "four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitation: Activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The regulations further provide:

> If we rate the degree of your limitation in the first
> three functional areas as "none" or "mild" and "none" in
> the fourth area, we will generally conclude that your
> impairments(s) is not severe, unless the evidence
> otherwise indicates that there is more than a minimal
> limitation in your ability to do basic work activities.

Id. §§ 404.1520a(d)(1), 416.920a(d)(1).

In his decision, the ALJ determined that plaintiff's "medically determinable mental impairments of depression and anxiety, considered singly and in combination, do not cause more than minimal limitation in [plaintiff's] ability to perform basic mental work activities and are therefore nonsevere." (Tr. 27). The ALJ wrote that he had considered the four broad functional areas set forth in the regulations for evaluating mental disorders, and then set forth specific findings regarding each individual functional area. The ALJ then wrote that because plaintiff's "medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere." (Id.)

The ALJ's analysis of plaintiff's mental impairments was consistent with the regulations, and his conclusion that plaintiff's mental impairments were nonsevere is supported by substantial evidence on the record as a whole. Dr. Evans, plaintiff's family physician, repeatedly noted that plaintiff was not especially anxious, that her mood and affect were normal, and that she did not have a depressed mood. Consistent with this evidence, when plaintiff presented for evaluation at Mark Twain Behavioral Health, she reported that she was there because she was "trying to get Medicaid and Disability due to problems with rheumatoid arthritis and fibromyalgia." (Tr. 379). Plaintiff did

-25-

not describe mental health symptoms that caused any limitations on her ability to function, and instead stated only that she experienced "some anxiety in social settings" for which she took Xanax. While plaintiff testified that she had problems with her memory, she did not complain of such problems when she sought medical treatment, nor did any of her medical treatment providers note problems with her memory. In addition, while not dispositive, it is somewhat notable that Mr. Oliver, upon whose opinion plaintiff relies, determined that plaintiff's recent and remote memory was intact. None of plaintiff's physicians indicated that she had any functional restrictions due to mental impairments. While plaintiff does have anxiety and depression for which she takes medication, she testified that her medication helps her. See Patrick v. Barnhart, 323 F.3d 592, 596 (8th Cir. 2003) (if an impairment can be controlled by treatment or medication, it cannot be considered disabling). The ALJ also noted evidence indicating a strong situational component to plaintiff's mental disturbances; namely, the removal of her son from her home. Situational depression is not disabling. See Dunahoo v. Apfel, 241 F.3d 1033, 1039-40 (8th Cir. 2001). In support of her argument that her mental impairments caused serious functional restrictions, plaintiff cites her hearing testimony. However, as discussed, infra, the ALJ properly discounted plaintiff's credibility regarding her claims of severe impairments.

The administrative record does not contain evidence

supporting the conclusion that plaintiff's mental impairments caused the functional loss necessary for a determination that her mental impairments were severe. See Buckner v. Astrue, 646 F.3d 549, 557 (8th Cir. 2011) (citing Trenary v. Bowen, 898 F.2d 1361, 1364 (8th Cir. 1990) (the mere presence of a mental disturbance is not disabling per se, absent a showing of severe functional loss establishing an inability to engage in substantial gainful activity). The ALJ's determination that plaintiff's mental impairments were nonsevere is supported by substantial evidence on the record as a whole.

C.    Credibility Determination

     The ALJ in this case examined the record and concluded that plaintiff's subjective allegations of pain and other symptoms precluding all work were not entirely credible. Plaintiff argues that the ALJ erred by not giving her testimony substantial credibility, stating that the ALJ simply issued a conclusory statement and failed to give specific reasons for his conclusion. Review of the record reveals no error.

     Before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of her subjective complaints. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217.) Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of her alleged physical impairment.

<u>Halpin v. Shalala</u>, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. <u>Polaski</u> at 1321-22. In <u>Polaski</u>, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

> <u>Id.</u> at 1322.

Although the ALJ is not free to accept or reject the claimant's subjective complaints based upon personal observations alone, he may discount such complaints if there are inconsistencies in the evidence as a whole. <u>Id.</u> The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working. <u>Gregg</u>, 354 F.3d at 713-14. When an ALJ explicitly considers the <u>Polaski</u> factors and discredits a claimant's complaints for a good reason, that decision

should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective testimony is primarily for the ALJ, not the courts, to decide, and the court considers with deference the ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005).

In assessing plaintiff's credibility, the ALJ in this case wrote that he had considered plaintiff's subjective allegations in accordance with 20 C.F.R. §§ 404.1529 and 416.929, and Social Security Rulings 96-4p and 96-7p, which correspond with the Polaski decision and credibility determination. The ALJ then analyzed the evidence of record and noted several inconsistencies in the record detracting from plaintiff's credibility.

The ALJ in this case conducted an exhaustive analysis of all of the medical evidence of record, and determined, as one factor detracting from plaintiff's credibility, that her allegations of pain and other symptoms precluding all work were not supported by the medical evidence. While an ALJ may not discount a claimant's subjective complaints based solely upon a lack of supporting medical evidence, the lack of such evidence is one factor an ALJ may consider in analyzing a claimant's credibility. See Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider). The ALJ discussed plaintiff's medical treatment, noting her diagnoses and her complaints of chronic pain. The ALJ also noted that examinations routinely revealed full range of motion,

and full muscle strength and muscle tone. The ALJ also noted plaintiff's mental health treatment with Dr. Evans, and Dr. Evans's observations that plaintiff did not appear anxious and had a normal mood and affect with no depressed mood. The ALJ noted that, when plaintiff presented to the Hannibal clinic in April of 2009, she requested a higher dosage of Cymbalta but stated that she was doing okay mood-wise. After analyzing all of the medical evidence of record, the ALJ concluded that plaintiff's impairments could be expected to cause the symptoms she alleged, but that her statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely credible. While the lack of objective medical evidence is not dispositive, it is an important factor, and the ALJ was entitled to consider the fact that the objective medical evidence did not support the degree of alleged limitations. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); Kisling v. Chater, 105 F.3d 1255, 1257-58 (8th Cir. 1997); Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989) (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered); Johnson v. Chater, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination).

The ALJ also noted that plaintiff's medications and other treatment modalities were effective. This observation is

consistent with the record and with plaintiff's hearing testimony.
The ALJ noted that plaintiff's medications and the median branch
blocks performed by Dr. Glanton were noted to help her symptoms,
and that Lasix was effective in controlling her edema. Indeed,
there are numerous references in the record to the effectiveness of
the medications plaintiff took for her physical and psychological
symptoms. Consistently, plaintiff testified that the medications
she took for her physical and mental impairments helped her and
caused no side effects. When an impairment is controlled by
medication or treatment, it cannot be considered disabling.
Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).

In support of her argument regarding the ALJ's
credibility assessment, plaintiff reiterates many of her statements
regarding the severity and limiting effects of her impairments.
For example, plaintiff states that, due to her conditions, she must
do everything while seated in a computer-type chair with wheels,
and must use a hand-held grabber to pick up objects. Plaintiff
states that her husband must comb her hair; she must lie in a dark
room; she naps frequently during the day; she uses an electric
wheel chair at the store; she has severe restrictions on her
ability to walk, stand, and use pedals on her car; and sitting is
very painful for her. The undersigned also notes plaintiff's
hearing testimony that she can walk only for a few minutes; that
she had to sit for hours with her feet propped up; that she had
crying spells every other day that lasted for two to three hours;

that she had panic attacks three times per month that lasted three to four hours; that she had migraine headaches that occurred twice per week and lasted for three hours each; and that depression caused her to not get dressed four days per week and to spend all day in bed four times per month. When plaintiff saw her various medical treatment providers, she did not describe symptoms and/or limitations of such an extreme degree. Furthermore, the medical records contain no indication that diagnostic testing, psychiatric evaluation, or any other type of evaluation was recommended, as would reasonably be expected had plaintiff described symptoms and limitations of such an alarming nature. See <u>Russell v. Sullivan</u>, 950 F.2d 542, 545 (8th Cir. 1991) (upholding finding that claimant's reported pain was not credible where claimant's statements to medical professionals were inconsistent).

Nor did any of plaintiff's doctors suggest to her that she restrict her activities to the extent plaintiff testified she did. Instead, plaintiff's doctors encouraged her to be more physically active, including observing a regular exercise regimen that included exercising on a treadmill. Regarding plaintiff's statements that she had to take frequent daytime naps, when plaintiff complained of fatigue and trouble sleeping and was referred for a sleep study, she was told following the sleep study to avoid napping during the day. She has never been diagnosed with chronic fatigue syndrome. In addition, while plaintiff testified that she had to sit with her feet elevated because of edema in her

lower extremities, Dr. Evans noted that Lasix controlled plaintiff's lower extremity edema, and in 2010 Dr. Jackson noted that plaintiff had no edema. The evidence of record suggests that plaintiff's functional limitations are due more to her own choice than to any medical or psychological condition. See Blakeman v. Astrue, 509 F.3d 878, 882 (8th Cir. 2007) ("The issue is not whether [the claimant] was credible in testifying that he naps each weekday afternoon he is not working. The issue is whether his heart condition compels him to nap each afternoon").

The ALJ also noted that plaintiff's subjective allegations of disabling physical and mental symptoms were out of proportion with her activities of daily living. The ALJ noted plaintiff's statements that she got her daughter up each morning, fed her breakfast, and sent her to school; picked up around the house during the day; had family time, dinner, and baths before bedtime; was independent in her self-care; had regular contact with family and friends in her own home and in theirs; and participated in a pageant organization. While daily living patterns are not alone dispositive of a claimant's credibility, an ALJ is entitled to consider them as one factor relevant to credibility determination. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007) (it is well-settled that an ALJ may properly consider daily activities as one factor in evaluating the credibility of a claimant's subjective complaints).

A review of the ALJ's credibility determination shows

that he evaluated plaintiff's credibility in a manner consistent with the requirements of <u>Polaski v. Heckler</u>. The ALJ did not, as plaintiff suggests, simply issue a conclusory statement that plaintiff's allegations were inconsistent with the objective medical evidence. Instead, the ALJ considered plaintiff's allegations on the basis of the record before him, and set forth numerous inconsistencies that, considered on the record as a whole, detracted from plaintiff's credibility. An ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. <u>Battles v. Sullivan</u>, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ did not conclude that plaintiff had no symptoms at all. He determined that plaintiff's statements that her symptoms precluded all work activity were not entirely consistent with the evidence on the record as a whole. "While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability." <u>Perkins v. Astrue</u>, 648 F.3d 892, 900 (8th Cir. 2011) (quoting <u>Jones v. Chater</u>, 86 F.3d 823, 826 (8th Cir. 1996)); <u>see</u> <u>also</u> <u>Gregg</u>, 354 F.3d at 713-14 (the "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working). Because the ALJ considered the <u>Polaski</u> factors and gave good reasons for discrediting plaintiff's subjective complaints, his credibility determination should be upheld. <u>Hogan</u>, 239 F.3d at 962.

D.   RFC Determination

The ALJ determined that plaintiff retained the residual functional capacity to perform sedentary work with some restrictions, as explained, supra.  Plaintiff argues that the ALJ's RFC determination fails to reflect all of her limitations; that the ALJ failed to consider the impact of her obesity on her ability to work; and that the ALJ improperly discredited Mr. Oliver's opinion. Review of the record reveals no error.

Residual functional capacity is defined as that which a person remains able to do despite her limitations.  20 C.F.R. §§ 404.1545(a), 416.945(a); Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations.  20 C.F.R. §§ 404.1545(a), 416.945(a); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005).

A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination.  Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce

-35-

evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance, <u>Pearsall</u>, 274 F.3d at 1217 (8th Cir. 2001); <u>McKinney</u>, 228 F.3d at 863, nor is the ALJ required to mechanically list and reject every possible limitation. <u>McCoy v. Astrue</u>, 648 F.3d 605, 615 (8th Cir. 2011). The claimant bears the burden of establishing her RFC. <u>Goff</u>, 421 F.3d at 790.

Plaintiff contends that the ALJ failed to consider the impact of plaintiff's obesity on her ability to work. Review of the ALJ's decision reveals no error.

When an ALJ identifies obesity as a medically determinable impairment, SSR 02-1p requires him to "consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments." SSR 02-1p at * 7. In this case, even though plaintiff did not allege obesity as a basis for disability, the ALJ asked plaintiff about her weight during the administrative hearing, and asked her what limitations it caused. In his decision, the ALJ acknowledged that plaintiff's physicians had included obesity as one of plaintiff's diagnoses. The ALJ determined that obesity was a severe impairment, wrote that he had considered obesity in accordance with Social Security Ruling 02-1p, and wrote that he had determined that obesity limited plaintiff's ability to engage in work activity. The ALJ then described plaintiff's RFC as restricted to sedentary work with limitations in each postural category. The ALJ's specific findings regarding

obesity are more than adequate to show that the ALJ properly considered functional restrictions resulting from obesity in his RFC assessment. In addition, the ALJ restricted plaintiff to sedentary work with limitations in each postural category. This represents serious functional restrictions, and supports the conclusion that the ALJ properly considered all of plaintiff's impairments and resulting functional restrictions. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (The ALJ's finding that plaintiff was limited to sedentary work is itself a significant limitation). While the ALJ did not present his RFC findings in bullet-point format with each limitation followed by a discussion of the supporting evidence, such a rigid format is not required by the Commissioner's regulations or by the Eighth Circuit.

Plaintiff argues that because of her "extreme obesity, chronic low back pain, and osteoarthritis of weight-bearing joints" she would "obviously be more limited than suggested by the ALJ's RFC finding." (Docket No. 13 at page 14). Plaintiff notes that she needed to lie down every day, necessitating unscheduled breaks which would be intolerable to any employer. However, the record fails to support that plaintiff's need to lie down every day was due to her impairments. While plaintiff was diagnosed with obesity, none of her doctors indicated that her weight imposed any functional restrictions or necessitated lying down every day. To the contrary, plaintiff's doctors encouraged her to engage in more physical activity, including regular exercise on a treadmill, and

plaintiff was told following her sleep study that she should not nap during the day. As discussed above, the fact that plaintiff lays down every day appears to be due more to her own choice than to any functional limitation caused by her impairments. The ALJ in this case conducted an exhaustive review of the evidence of record, and incorporated into his RFC determination those restrictions he determined were credible following his legally sufficient determination of plaintiff's credibility. <u>See</u> <u>McGeorge v. Barnart</u>, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC determination to only the impairments and limitations he found to be credible based on his evaluation of the entire record").

Plaintiff next contends that the ALJ erroneously dismissed Mr. Oliver's psychological opinion. Plaintiff also suggests that the ALJ should have ordered a psychological evaluation. Review of the record reveals no error.

The ALJ in this case discussed Mr. Oliver's opinion, and wrote that he was giving it no weight. As the Commissioner correctly argues, there is no reason the ALJ should have treated Mr. Oliver's opinion any differently. First, there was no treating relationship between plaintiff and Mr. Oliver. Plaintiff saw Mr. Oliver on only one occasion, stating that she was there for an evaluation because she was trying to qualify for Medicaid and Disability benefits due to rheumatoid arthritis and fibromyalgia. While the opinion of a treating physician is generally entitled to great weight, the opinion of a consultant who has examined the

claimant only once is not entitled to the same consideration. <u>See</u>
<u>Kirby v. Astrue</u>, 500 F.3d 705, 709 (8th Cir. 2007) (the opinion of
a consultant deserves no special weight).

Second, as the ALJ recognized, Mr. Oliver was a licensed
clinical social worker and was therefore not an "acceptable medical
source" as such is defined in the Regulations. 20 C.F.R. §§
404.1513(a), 416.913(a). The Regulations provide that evidence to
establish disability must come from "acceptable medical sources,"
which are defined as licensed medical or osteopathic physicians,
licensed or certified psychologists, licensed optometrists,
licensed podiatrists, and qualified speech-language pathologists.
20 C.F.R. §§ 404.1513(a)(1)-(5), 416.913(a)(1)-(5). As a licensed
clinical social worker, Mr. Oliver would be considered by the
regulations as an "other source" whose opinion may be used to show
the severity of an impairment and how it affects a claimant's
ability to work. 20 C.F.R. §§ 404.1513(d), 416.913(d).

Third, as the Commissioner notes, Mr. Oliver overstepped
his expertise as a social worker when he offered opinions regarding
the interplay between plaintiff's mental impairments and her
physical impairments. This is especially so considering the fact
that Mr. Oliver did not indicate that he reviewed any medical
records before formulating such opinions.

However, the undersigned does note that Mr. Oliver's
report indicates that it was read and approved by Andrew Lovy, D.O.
Dr. Lovy would be an "acceptable medical source" as defined in the

regulations. Even so, the ALJ's treatment of Mr. Oliver's opinion is supported by substantial evidence on the record as a whole.

As the ALJ noted, the opinions expressed in Mr. Oliver's opinion appeared to be based solely upon Mr. Oliver's interview with plaintiff. An ALJ is entitled to discount an opinion where it is based largely on a claimant's subjective complaints rather than on objective medical evidence. Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012). As fully set forth in the foregoing discussion regarding the ALJ's credibility determination, plaintiff's statements regarding her limitations are not entirely credible, and the ALJ was entitled to disregard an opinion that appeared to based solely upon those statements. Furthermore, an ALJ may disregard the opinion of a treating physician when it is unsupported by medically acceptable clinical or diagnostic data and/or inconsistent with the other substantial evidence of record. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).

In addition, Mr. Oliver's opinion that plaintiff's physical and mental health issues would preclude her from engaging in full time competitive work is not the type of opinion, even when it comes from an acceptable medical source, to which the Commissioner generally gives controlling weight. "A medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis, 392 F.3d at 994 (citing Stormo v.

<u>Barnhart</u>, 377 F.3d 801, 807 (8th Cir. 2004)).

Mr. Oliver's opinion also conflicts with the opinion of Dr. Stacy that plaintiff's difficulties were mild. In fact, Mr. Oliver's opinion finds no support in any of the other medical evidence of record. An ALJ may properly reject the opinion of even a treating physician if it is inconsistent with other substantial evidence of record. <u>Reed</u>, 399 F.3d at 920.

Plaintiff also contends that the ALJ should have ordered a consultative psychological examination. It is well-settled that the ALJ is required to ensure a fully and fairly developed record. <u>Nevland v. Apfel</u>, 204 F.3d 853 (8th Cir. 2000) (citing <u>Warner v. Heckler</u>, 722 F.2d 428, 431 (8th Cir. 1983)). An ALJ is required to order a consultative examination when the evidence as a whole is insufficient to support a decision on a claim. <u>See</u> 20 C.F.R. §§ 404.1519a(b); 416.919a(b). An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision. <u>Anderson</u>, 51 F.3d at 779. In this case, there is no indication that the ALJ felt unable to make the assessment he did and, as discussed above, substantial evidence supports the ALJ's decision. Plaintiff also fails to acknowledge that the ALJ's RFC determination was influenced by his determination that plaintiff's allegations were not fully credible and, for the reasons discussed above, this Court defers to that determination. <u>See</u> <u>Hogan</u>, 239 F.3d at 962; <u>Tellez</u>, 403 F.3d at 957.

Plaintiff also suggests that there are medical records that support the conclusion that she is disabled. As required, the undersigned has considered the evidence which "fairly detracts from the ALJ's findings." <u>Groeper v. Sullivan</u>, 932 F.2d 1234, 1237 (8th Cir. 1991); <u>see also</u> <u>Briggs v. Callahan</u>, 139 F.3d 606, 608 (8th Cir. 1998). However, where, as here, substantial evidence supports the ALJ's decision, that decision may not be reversed merely because substantial evidence may support a different outcome. <u>Briggs</u>, 139 F.3d at 608; <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992), <u>citing</u> <u>Cruse</u>, 867 F.2d at 1184.

Review of the ALJ's RFC determination reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole. The ALJ conducted a legally sufficient credibility determination, properly considered all of the evidence of record, properly considered obesity and the restrictions imposed thereby, properly weighed the opinion evidence, and fulfilled his duty to ensure a fully and fairly developed record. Having reviewed the ALJ's decision with the requisite deference, the undersigned concludes that it is supported by substantial evidence on the record as a whole.

Therefore, on the claims that plaintiff raises,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed, and plaintiff's Complaint is dismissed with prejudice.

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 28th day of September, 2012.